<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                        :
EDWARD BOYARKO,                          :
                                        :     Civil No. 05-3330
            Plaintiff,                   :
                                        :
            v.                           :     **OPINION**
                                        :
JO ANNE B. BARNHART,                     :
COMMISSIONER OF THE SOCIAL               :
SECURITY ADMINISTRATION,                 :
                                        :
            Defendant.                   :
_____:


<u>**Chesler, District Judge**</u>

        This matter comes before the Court on the appeal by plaintiff Edward D. Boyarko, Sr.

("Boyarko") of the final decision of the Commissioner of Social Security ("Commissioner")

determining that he is not eligible for Social Security disability benefits under the Social Security

Act.  This Court exercises jurisdiction pursuant to 42 U.S.C. § 405(g).  Having considered the

submissions of the parties without oral argument pursuant to L. Civ. R. 9.1(b), and for the

reasons that follow, the Court finds that the ALJ's decision was supported by substantial

evidence and is hereby **AFFIRMED**, and plaintiff's appeal is **DENIED**.

**I.      FACTS**

        **A.      Background**

        Plaintiff, Edward Boyarko, is a 53-year old individual with a 12th grade education.  He

brings this action as an appeal of an administrative law judge's ("ALJ") decision denying him

benefits under the Social Security Act ("SSA").  According to the record, plaintiff's past work

history includes employment as a liquor store clerk, deli clerk, airport limo driver, and auto salesman.  (Tr. 102, 115.)[1]

Plaintiff applied for Social Security benefits on February 25, 2002.  (Tr. 100-113.)  In his application, plaintiff described his limiting conditions as "diabetes, neuropathy, eyes, brain unbalance, stroke, heart problems."  (Tr. 101.)  Plaintiff claimed these conditions limited his ability to work in that he was required to take medications every four hours and experienced different reactions to the medications.  (Tr. 101.)  Plaintiff stated his condition first bothered him in November 1962 and first prevented him from working on September 1, 2001.  (Tr. 101.)  Plaintiff was eligible for disability benefits through December 31, 2004.  (Tr. 98.)

### B.     Plaintiff's Medical History

Plaintiff has been a diabetic since 1962 and must have insulin administered to him each day.  (Tr. 38, 208.)  Dr. Martin Sorger treated plaintiff from January 22, 1976 until March 14, 2002 for various medical problems, including carpal tunnel syndrome, hand and foot pain, and hip pain.  (Tr. 197-208.)  Plaintiff underwent surgery to correct carpal tunnel syndrome in 1976, surgeries to correct trigger fingers in 1982, 1983, 1985, 1987, and 1992, and was referred to physical therapy in 1997 for hip pain.  (Tr. 202-208.)

Plaintiff treated with Dr. Joseph Patti since 1986 for proliferative diabetic retinopathy in both eyes.  (Tr. 224.)  Plaintiff underwent laser treatments on both eyes in the 1980s.  (Tr. 237.)  Plaintiff's most recent appointment with Dr. Patti was on October 3, 2001, after which Dr. Patti did not recommend any further treatment.  (Tr. 225, 228.)

---

[1] "(Tr. _____.)" shall refer to pages within the administrative record, which has been submitted to the Court.

The record shows that plaintiff saw Dr. John Robinton on December 18, 2001, complaining of imbalance, dizziness, left-sided eye pain and intermittent pain and paresthesias involving the left foot. (Tr. 187.) Dr. Robinton concluded that there were no changes in cranial nerve testing, motor strength was five out of five ("5/5"), there was slight distal sensory loss, and cerebellar testing was normal. (Tr. 187.) Gait testing revealed a narrow base with an equal armswing, heel, toe, and tandem walking were done reasonably well, reflexes were symmetric, and toes were downgoing. (Tr. 187.) Dr. Robinton's impression was persistent unsteadiness with little objective evidence of dysfunction, for which he recommended a neurotology evaluation. (Tr. 187.)

Upon Dr. Robinton's recommendation, plaintiff saw neurologist Dr. Phillip Kramer on February 21, 2002, and reported dizziness when walking and pain and numbness on his left side with no associated vertigo, nausea, or vomiting. (Tr. 246.) Plaintiff mentioned that he no longer drove because of his vision problems, which caused the road to appear to float in front of him. (Tr. 246.) Plaintiff's visual acuity was 20/50 in the right eye and 20/70 in the left without spectacle correction, and there was a decrease in visual acuity to 20/70 with head shaking and viewing with both eyes. (Tr. 246.) Visual tests revealed a full range of eye motion with no abnormal ocular misalignment or lid lag, saccades that were promptly initiated, accurate and of normal speed, intact convergence, and no nystagmus. (Tr. 247.) Upon motor examination, Dr. Kramer noted no focal loss in strength or change in tone in his upper extremities and rapid movements of the feet and hands were well performed. (Tr. 247.)

After extensive medical testing and reviewing an MRI taken approximately one year earlier, Dr. Kramer opined that plaintiff's primary problem was not vestibular, but ordered

3

vestibular testing based on plaintiff's complaints about his vision while driving.  (Tr. 247.)  Dr. Kramer's impression as to plaintiff's imbalance while walking was that it was caused by an abnormality in his leg.  (Tr. 247.)  Nevertheless, Dr. Kramer recommended that plaintiff undergo an MRI of his neck.  (Tr. 247.)

Physical therapist Marie-Paule Landa also saw plaintiff on February 21, 2002 and reported that his ranges of motion were within functional limits for both upper and lower extremities and that his strength was grossly 4-/5.  (Tr. 245.)  All motion sensitivity tests were negative.  (Tr. 245.)  However, plaintiff demonstrated a slightly unsteady gait when ambulating approximately fifty feet without any loss of balance.  (Tr. 245.)  Ms. Landa opined that the plaintiff might benefit from physical therapy for balance retraining in light of his difficulties ambulating.  (Tr. 245.)

In a report to the state agency dated April 9, 2002, endocrinologist Dr. Maris Davis stated that she saw plaintiff every three months since April 1999, the most recent examination taking place on January 24, 2002.  (Tr. 212, 215.)   In her report, Dr. Davis noted that plaintiff had previously undergone laser eye treatment to correct his poor vision, resulting in poor night vision, and catheterization to treat his coronary artery disease, for which he was being maintained on blood pressure and lipid lowering medication.  (Tr. 212.)  Plaintiff also had a history of renal disease, which was maintained with the use of an ACE inhibitor that plaintiff had used since 1992.  (Tr. 212.)  Dr. Davis also noted that plaintiff had profound diabetic neuropathy, resulting in lower extremity numbness, connective tissue disease, and he required reparative surgeries for hand contractures.  (Tr. 212.)  In response to plaintiff's reported dizziness and vertigo, Dr. Davis reported that plaintiff was under evaluation by a neurologist.  (Tr. 213.)  Dr. Davis further opined

4

that driving would be problematic due to plaintiff's inability to stabilize the car while experiencing the symptoms.  (Tr. 213.)  At the time, plaintiff was on a medication regimen of Atenolol, Vasotec, Zocor, Plavik, folic acid, Lancets insulin, and Humalog to treat his diabetes. (Tr. 213.)

On April 9, 2002, Dr. Davis's impression of plaintiff's overall condition was that he was not capable of endeavoring a very physically challenging job involving heavy lifting because of his cardiac disease.  (Tr. 213.)  Dr. Davis also reported significant visual impairment, restricting plaintiff's ability to drive, especially at night.  (Tr. 213.)  Dr. Davis opined that plaintiff could physically complete a desk job, but expressed uncertainty as to how long he would be capable of performing fine and gross motor movements over a long period of time due to the prior release procedures and the neuropathic changes in his hands.  (Tr. 213-214.)

At the referral of Dr. Kramer, plaintiff underwent electronystagmography and rotary chair testing on April 11, 2002.  (Tr. 241.)  Results revealed normal middle ear function and slow and hypometric horizontal saccades consistent with a central nervous system dysfunction.  (Tr. 241, 243.)  Pursuit and optokinetic nystagmus test results were also normal.  (Tr. 241.)  It was recommended that plaintiff complete an audiological evaluation to determine the nature of his hearing loss and attend hearing screenings to monitor audiological status.  (Tr. 243.)

In a report dated April 15, 2002, Dr. Neal Yudkoff, who treated plaintiff for 19 years, noted that he primarily provided diabetic foot care, consisting of toenail trimming and occasionally removal of ingrown toenails.  (Tr. 220.)  Dr. Yudkoff last saw plaintiff on April 9, 2002.  (Tr. 220.)  Dr. Yudkoff reported that plaintiff had only recently begun complaining of virtual numbness in both feet.  (Tr. 220.)

5

Plaintiff saw Dr. C. Springer of Retina Associates on May 24, 2002.  (Tr. 227.)  At that time, plaintiff reported that there had been no change in his visual acuity since his last appointment, which was on October 3, 2001, but continued to complain of occasional "floaters and flashers."  (Tr. 227.)  Dr. Springer's report indicated that plaintiff's occular motility and conjunctiva were normal in both eyes.  (Tr. 227.)  Dr. Springer did not recommend any further treatment, but noted that glasses would increase plaintiff's visual acuity.  (Tr. 227.)

Plaintiff visited Dr. Kramer again on June 13, 2002, for a follow-up appointment for imbalance.  (Tr. 238.)  At that time, Dr. Kramer noted that plaintiff's symptoms had not changed and that symptoms were most problematic while walking.  (Tr. 238.)  Plaintiff reported that he did not drive a car frequently and if he did drive, it was only for short distances.  (Tr. 238.)  Dr. Kramer further noted that the vestibular testing results were normal except for slow horizontal saccades.  (Tr. 238.)  Upon examination, Dr. Kramer found plaintiff's vestibular ocular reflex both vertically and horizontally was normal.  (Tr. 238.)  Dr. Kramer also found there were no nystagmus and horizontal saccades were on the slow side of normal or possibly normal, and remained conjugate.  (Tr. 238.)  Dr. Kramer recommended that plaintiff seek vestibular physical therapy to help with his imbalance and come back for a follow-up appointment in January 2003. (Tr. 238.)

On June 19, 2002, plaintiff saw Dr. Francky Merlin at the request of the New Jersey Department of Labor, Division of Disability Determination Services.  (Tr. 255.)  At that time, plaintiff's chief complaints were high blood pressure, diabetes, and arthritis.  (Tr. 255.)  Dr. Merlin noted that plaintiff was a well-developed, well-nourished male who was alert, conscious, and oriented and in no acute distress.  (Tr. 256.)  Plaintiff's vision with glasses was 20/100 on the

right and 20/70 on the left.  (Tr. 256.)  Dr. Merlin's evaluation of plaintiff's eyes revealed that there were no conjunctivae injected, sclerae were not icteric, and pupils were equal, round and reactive to light and accommodation.  (Tr. 256.)  Plaintiff's station and gait were normal and plaintiff had no difficulty getting up from a seated position or getting on and off the examining table.  (Tr. 256.)  Dr. Merlin also reported plaintiff had full use of both hands and arms in dressing and undressing and plaintiff's grasping strength and manipulative function were not impaired.  (Tr. 256.)  Dr. Merlin noted there was pain in both of plaintiff's shoulders, loss of hair in both lower extremities and plaintiff's feet were cold.  (Tr. 256.)  At the time of the examination, plaintiff reported that he was working for a car service.  (Tr. 256.)

Dr. Merlin diagnosed plaintiff with diabetes mellitus, diabetic retinopathy and neuropathy, peripheral arterial disease, and unstable joint pain.  (Tr. 257.)  However, Dr. Merlin noted that plaintiff's hypertension was under control.  (Tr. 257.)  Dr. Merlin recommended that plaintiff follow-up with his endocrinologist, ophthalmologist, and neurologist as well as undergo evaluation by a vascular surgeon.  (Tr. 257.)  As to plaintiff's ability to do work related activities, Dr. Merlin opined that plaintiff could sit, stand, walk for a short period of time, handle objects, hear, speak, and travel, but should not lift or carry heavy objects or operate machinery.  (Tr. 257.)

State agency physician Dr. Robert Walsh performed a physical residual functional capacity assessment of plaintiff's condition on June 27, 2002.  (Tr. 262.)  Dr. Walsh found that plaintiff had the ability to lift and/or carry fifty pounds occasionally and twenty-five pounds frequently, stand and/or walk for a total of about six hours in an eight-hour workday, and sit for a total of about six hours in an eight-hour workday.  (Tr. 263.)  Further, Dr. Walsh found that plaintiff could push and/or pull consistent with his ability to lift and carry.  (Tr. 263.)  According

to Dr. Walsh, plaintiff could frequently perform postural activities, had unlimited manipulative abilities, and no visual, communicative, or environmental limitations.  (Tr. 264-66.)  In Dr. Walsh's judgment, plaintiff's claims as to the severity and duration of his symptoms were not consistent with the medical evidence of record, particularly noting that plaintiff's gait and station were normal.  (Tr. 267.)

Plaintiff reported in his disability application that he experiences various side effects from the medications he takes, including fatigue, slow heart rate, bruising, shaking, and blurred vision. (Tr. 106, 108, 123.)  In his activities of daily living questionnaire completed April 1, 2002, plaintiff reported that he could make small meals for himself, take out the garbage, vacuum, do dishes, drive short distances during the day, and watch television.  (Tr. 120.)  Plaintiff described a typical day as waking up, taking medications and a blood test, eating breakfast, watching television, walking around to relieve pain in his legs, rechecking his blood, injecting insulin, eating again, staying indoors until eating at supper time, watching more television or walking, and going to bed at 9:30 p.m. after taking more medication and blood work.  (Tr. 119.)

C.      **Procedural History**

i.      **Background**

On March 20, 2002, Mr. Boyarko filed an application for Disability Insurance Benefits under the Social Security Act.  (Tr. 100-13.)  Plaintiff claimed he was unable to work since September 1, 2001 due to "diabetes, neuropathy, eyes, brain unbalance, stroke, heart problems." (Tr. 101.)  The claim was denied initially and on reconsideration and then plaintiff filed a timely Request for Hearing.  (Tr. 53-59, 61-63, 64.)  ALJ Christopher K. Bullard held a hearing on August 3, 2004 in Manchester, New Jersey.  (Tr. 16.)

8

ii.     **The ALJ's August 25, 2004 Decision**

In the August 25, 2004 decision, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. 24.)  Among his findings, the ALJ found that plaintiff met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and was insured for benefits through the date of this decision; plaintiff had not engaged in substantial gainful activity since the alleged onset of disability; and plaintiff's coronary artery disease, diabetes, loss of vision, and vestibular disorder were considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).  (Tr. 23.)

Specifically, the ALJ found that plaintiff's allegations regarding his limitations were not totally credible and his medically determinable impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  (Tr. 23.)  The ALJ found that plaintiff had a high school or highschool equivalent education and was closely approaching advanced age.  (Tr. 24.)  Although he found that plaintiff was not able to perform any of his past relevant work, he further found that plaintiff had the residual functional capacity to: lift and carry up to ten pounds occassionally and less than ten pounds frequently; sit for about six hours (in one hour intervals); stand for about two hours (in fifteen minute intervals); walk for about one hour (in fifteen minute intervals); and could only occasionally climb stairs, balance, bend/stoop or be exposed to unprotected heights or moving/dangerous machinery.  (Tr. 23-24.)  The ALJ found that plaintiff had transferrable skills from skilled work previously performed and the residual functional capacity to perform a significant range of sedentary work.  (Tr. 24.)  Although the ALJ found that plaintiff could not perform the full range of sedentary work due to exertional

limitations, he found there were a significant number of jobs in the national economy that plaintiff could perform, including that of a telephone solicitor.  (Tr. 24.)  Lastly, the ALJ found that plaintiff was not under a "disability," as defined in the Social Security Act, at any time through the date of his decision.  (Tr. 24.)

In making these findings, the ALJ considered the opinions of plaintiff's treating physician, Dr. Maris Davis, including his diagnoses of plaintiff's condition and medical opinion concerning limitations on plaintiff's ability to work.  (Tr. 18-19, 21.)  In addition, the ALJ contemplated the medical reports of other physicians that examined and treated plaintiff.  (Tr. 18-21.)  The ALJ also considered plaintiff's statements concerning his impairments and their impact on his ability to work, but did not find them persuasive to establish disability in light of the degree of medical treatment required, the reports of examining and treating practitioners, and plaintiff's medical history.  (Tr. 21.)

In his opinion, the ALJ noted the hypothetical scenario he posed to the vocational expert at the hearing: assuming "an individual of plaintiff's age, education, and past relevant work, who could lift and carry up to ten pounds occasionally and less than ten pounds frequently, sit for about six hours (in one hour intervals); stand for about two hours (in fifteen minute intervals) and walk for about one hour (in fifteen minute intervals); and can only occasionally climb stairs, balance, bend/stoop and could not be exposed to unprotected heights or moving/dangerous machinery, and was unable to read written instructions and, could not work at a job that required good visual acuity."  (Tr. 22.)  Based on this hypothetical, the VE opined that plaintiff could not perform his past relevant work, but could perform work existing in significant numbers, specifically work as a telephone solicitor.  (Tr. 22.)  The ALJ concluded that plaintiff could not

return to any of his past relevant work, but based on the testimony of the vocational expert, plaintiff had transferrable skills from skilled work previously performed, including the ability to be persuasive, communicate with customers and explain products. (Tr. 22.)  Accordingly, in view of plaintiff's age, education, and vocationally relevant past work experience within the context of the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations, the ALJ found plaintiff not disabled. (Tr. 22.)

### iii.    The Instant Appeal

By letter dated September 9, 2004, plaintiff's attorney requested that the Appeals Council review the August 25, 2004 decision due to fundamental errors in the ALJ's analysis. (Tr. 10-12.)  Plaintiff argued that the ALJ did not properly apply Grid Rule 201.14 in finding plaintiff not disabled and failed to give proper weight to plaintiff's age in determining his disability status. (Tr. 10-11.)  Further, plaintiff argued that the ALJ erred by ignoring the testimony of the vocational expert. (Tr. 11.)  The Appeals Council denied plaintiff's request for review on June 17, 2005, finding no reason under the rules to review the ALJ's decision. (Tr. 4-7.)  On November 13, 2005, plaintiff filed the instant appeal from the August 25, 2004 decision.

## II.  DISCUSSION

### A.    Standard of Review

In reviewing an ALJ's denial of Social Security disability benefits, a district court must determine whether or not the decision was supported by "substantial evidence in the record."  42 U.S.C. § 405(g); Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000).  "Substantial evidence" means more than "a mere scintilla."  Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999) (quoting Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995)).  "It means such relevant evidence as a

reasonable mind might accept as adequate." Id.  If the ALJ's findings of fact are supported by substantial evidence, this Court is bound by those findings, "even if [it] would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 35 (3d Cir. 2001); see also Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

The Third Circuit has made it clear "that determination of the existence vel non of substantial evidence is not merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) (emphasis in original).  In reaching a conclusion that a claimant is capable of performing work, the ALJ must analyze all the evidence and explain the weight the ALJ has given to probative exhibits. Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).  Access to the ALJ's reasoning is essential to a meaningful court review. Fargnoli, 247 F.3d at 42.  Nevertheless, a District Court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).

**B.     Standard for Awarding Benefits Under the Act**

An individual may not receive disability insurance benefits under the Act unless he or she first meets statutory insured status requirements. See 42 U.S.C. § 423, Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).  To be considered disabled, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  Thus, a claimant is not disabled unless "his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To demonstrate that a disability exists, a claimant must present evidence that his or her affliction "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically accepted clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  An individual's subjective complaints are not enough to establish a disability. Further, the claimant bears the burden of proving the existence of the alleged disability.  42 U.S.C. § 423(d)(5)(A).

In reviewing a claim for disability insurance benefits, the ALJ must undertake a five-step evaluation process.  See 20 C.F.R. § 404.1520, Bowen v. Yuckert, 482 U.S. 137, 140 (1987). First, the ALJ must determine whether or not the claimant is currently engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a).  If the claimant is engaged in substantial gainful activity, the application must be denied.  See 20 C.F.R. § 404.1520(b).  If the claimant is not employed, the ALJ proceeds to step two and determines whether or not the claimant has a "severe impairment" or "combination of impairments."  20 C.F.R. § 404.1520(c).  A claimant who does not have a "severe impairment" is not disabled.  Id.  Third, if the impairment is found to be severe, the ALJ determines whether or not the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listing").  If so, the claimant is conclusively presumed to be disabled, and the evaluation ends.  See 20 C.F.R. § 404.1520(d).

If, however, claimant's impairment is found not to meet or equal a listed impairment under the Listing, as was the case here, the ALJ proceeds to step four, which requires a

determination of whether or not the limits imposed by claimant's impairment (i.e., the "Residual

Functional Capacity" or "RFC") prevent the claimant from returning to the work claimant

performed in the past ("Past Relevant Work" or "PRW").  See 20 C.F.R. § 404.1520(e).  If the

claimant is found capable of performing his PRW, the claimant is not disabled.  Id.  If the

claimant is no longer able to perform his PRW, the evaluation must continue to the last step.

The fifth and final step in the evaluative process requires a determination of whether the

claimant, with their RFC, is capable of performing some other work available in the national

economy.  In this last step, the burden shifts to the Commissioner to show that "there are other

jobs existing in significant numbers in the national economy which the claimant can perform,

consistent with her medical impairments, age, education, past work experience, and residual

functional capacity."  Plummer, 186 F.3d at 428 (citing 20 C.F.R. § 404.1520(f)).  Benefits are

denied if work exists in the national economy in which the claimant could engage given the

above-listed factors.

### C.    Plaintiff's Appeal

In this appeal, plaintiff argues: (1) the matter should be remanded for a hearing to

determine the proper onset date of disability because the Social Security Administration

subsequently awarded plaintiff disability benefits; (2) the ALJ erred by failing to give controlling

weight to plaintiff's treating doctor; (3) the ALJ improperly determined that plaintiff had

transferrable skills and subsequently failed to properly follow the medical vocational guidelines

in finding plaintiff disabled; (4) the ALJ improperly disregarded the vocational expert testimony

concerning plaintiff's ability to perform his past relevant work or perform any work based on the

limitations in the record; and (5) the ALJ erred by failing to consider the side effects of plaintiff's

14

medications on his ability to work and improperly evaluating plaintiff's credibility.  For the reasons that follow, the Court affirms the ALJ's determination.

### i.        Onset Date of Plaintiff's Disability

Plaintiff argues that the Social Security Administration failed to follow Social Security Ruling 83-20 in determining the onset date of his disability.  (Pl. Br. at 6-8.)  He argues that the onset date of his disability was ambiguous and that the ALJ's determination regarding the onset date of disability was not based on substantial evidence as he rejected the testimony of two physicians and failed to obtain an independent medical expert opinion as to the onset date.  (Id. at 7.)

Social Security Ruling 83-20 states that the relevant factors in determining disability onset for disabilities of a non-traumatic origin are the individual's allegation, work history, and medical evidence.  Here, plaintiff's disability is of a non-traumatic origin.  Plaintiff's alleged onset date of disability is September 1, 2001. (Tr. 101.)  Plaintiff also reported that he was no longer able to work on September 1, 2001, which is consistent with his alleged onset date of disability.  (Tr. 101.)  Further, medical evidence in the record does not suggest an earlier onset date, but seems to support plaintiff's purported onset date.  In his decision, the ALJ mistakenly identified plaintiff's onset date as September 30, 2001.  (Tr. 17.)  Nonetheless, even if plaintiff's onset date of disability were properly identified as September 1, 2001, this would have no significant effect on the analysis because plaintiff was found not disabled based on the ALJ's determination that he could perform work existing in significant numbers in the national economy.

ii.     **The ALJ's Consideration of the Testimony of Plaintiff's Treating Physician**

Plaintiff argues that the ALJ erred by failing to give controlling weight to the plaintiff's treating physician, Dr. Maris Davis.  (Pl. Br. 8-10.)  Specifically, plaintiff argues that the ALJ misstated Dr. Davis's opinion that plaintiff could perform sedentary work and deemed the ALJ's denial of benefits an "obvious rejection" of Dr. Davis's medical opinion.  (Pl. Br. 8.)  In opposition, the Commissioner argues that the ALJ comprehensively considered the medical records of Dr. Davis, specifically referencing both limitations and abilities.  (Def. Br. At 17.)

Courts must give a treating physician's opinion controlling weight when it is "well-supported" by accepted medical techniques and consistent with "other substantial evidence on the record."  28 C.F.R. § 404.1527(d)(2).   The Third Circuit has recognized a "particularly acute need" for the ALJ to articulate the level of weight given to one piece of testimony over the other. See e.g., Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001).

While the ALJ does not specifically state the level of weight assigned to Dr. Davis's testimony, the Court is satisfied that the ALJ's consideration of Dr. Davis's testimony was sufficient.  First, the ALJ summarized Dr. Davis's findings in some detail and, therefore, clearly considered them at length.  Second, the Court does not find a lack of analysis by the ALJ that leaves it wondering how he weighed or reconciled some conflicting evidence.  Thus, the ALJ did not prefer conflicting evidence over Dr. Davis's report.  Third, there is no indication that the ALJ gave Dr. Davis's testimony anything but controlling weight.  Indeed, the Court finds that the medical opinion of Dr. Davis, as summarized by the ALJ, is not inconsistent with the ALJ's ultimate conclusions.

Plaintiff's argument here appears to center on the ALJ's interpretation of Dr. Davis's statement that "[i]f [plaintiff] were capable of performing a desk job he might be able to physically complete that sort of job." (Tr. 213.) Plaintiff's argument further relies on Dr. Davis's statements that the prior release procedures plaintiff underwent on his hand made it unclear as to whether he would be capable of performing fine and gross motor movements over long periods of time and that neuropathic changes in plaintiff's hand would "probably limit his ability to predictably use fine motor coordination." (Tr. 213-214.) Three months earlier, however, Dr. Kramer noted that rapid movements of the feet and hands were well performed. (Tr. 247.) On June 19, 2002, Dr. Merlin dispelled any uncertainty as to plaintiff's ability to use fine motor coordination, noting that plaintiff had full use of both hands and arms in dressing and undressing and that plaintiff's grasping strength and manipulative function were not impaired. (Tr. 256.) Further, on June 27, 2002, Dr. Walsh confirmed Dr. Merlin's assessment, finding that plaintiff could frequently perform postural activities, had unlimited manipulative abilities, and had no visual, communicative, or environmental limitations. (Tr. 264-266.)

Based on all of this medical evidence, the ALJ concluded that plaintiff was restricted from performing heavy lifting, but he would be physically capable of performing a desk job. (Tr. at 19.) Given the totality of the record, the Court finds that the ALJ's interpretation of Dr. Davis's testimony was reasonable, and supports his conclusion that plaintiff could perform sedentary work. For these reasons, the Court finds the petitioner's argument that the ALJ failed to give his treating physician controlling weight unpersuasive.

17

### iii.    The ALJ's Finding of Transferrable Skills and Application of Medical Vocational Rule 201.14

Plaintiff argues that the ALJ did not properly apply Medical Vocational Guideline 201.14 in assessing plaintiff's RFC.  (Pl. Br. 10.)  Plaintiff claims that because he has an RFC for sedentary work, is closely approaching advanced age, is a high school graduate who previously worked in semi-skilled work and has no transferrable skills, a finding of disability is warranted under Medical Vocational Guideline 201.14.  (Pl. Br. 10.)  In particular, plaintiff submits that he did not acquire transferrable skills in his previous work, but rather possessed certain "worker traits" that were not transferrable.  (Pl. Br. at 11-16.)

The Commissioner argues that the ALJ properly found that plaintiff had transferrable skills and, therefore, correctly applied Medical Vocational Guideline 201.15 in finding plaintiff not disabled.  (Def. Br. at 25.)  In response to plaintiff's submission that he merely possessed worker traits and not transferrable skills, the Commissioner asserts that the specific abilities identified by the vocational expert are not worker traits, but are skills and transferrable.  (Def. Br. at 25-29.)

Skills are defined as "knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through the performance of an occupation which is above the unskilled level (requires more than 30 days to learn)."  Social Security Ruling 82-41 at § 2(a).  Skills give a person a "special advantage over unskilled workers in the labor market."  Id.  The rule goes on to instruct that "[i]t is the acquired capacity to perform the work activities with facility (rather than the traits themselves) that gives rise to potentially transferrable skills."  Id. at § 2(d).  See also 20 C.F.R. §

404.1565(a).

The vocational expert testified that, while working as a liquor store clerk and car salesman, plaintiff acquired the transferrable skills of communicating with customers, being persuasive, dealing with the public, treating people with tact and courtesy, and having knowledge of products and services being offered.  (Tr. 48-49.)  The abilities of being persuasive and having knowledge of products and services offered are more appropriately defined as skills in that they were not gained by doing unskilled work, as working in the liquor store was semi-skilled work and the car sales was skilled work.  Further, the ability to be persuasive is not innate or merely a trait; to the contrary, the ability to be persuasive is an acquired talent that requires training and provides some advantage in the sales industry.  These qualities are not abilities and aptitudes necessary in nearly all jobs, see 20 C.F.R. § 404.1521(b), but specific to jobs involving the sale of products or services.  Therefore, this Court agrees with the ALJ that plaintiff acquired skills, as opposed to traits, during his previous work as a liquor sales clerk and car salesman.

Moreover, the skills acquired by plaintiff during his previous work are undeniably transferrable.  Social Security Ruling 82-41 defines transferability as "applying work skills which a person has demonstrated in vocationally relevant past jobs to meet the requirements of other skilled or semi-skilled jobs."  Social Security Ruling 82-41 at § 2(b).  20 C.F.R. § 404.1568(d)(2) states that "transferability is most probable and meaningful among jobs in which the same or lesser degree of skill is required, the same or similar tools and machines are used, and the same or similar ... services are involved."  Plaintiff has past work experience in both semi-skilled and skilled jobs, as a liquor store clerk and car salesman, respectively.  Therefore, the regulation infers that transferability is probable as the telephone solicitor job is a semi-skilled occupation,

19

which requires the same degree of skill as a liquor store clerk and a lesser degree of skill than a car salesman.  The regulation further instructs a finding of transferability because the same service, namely sales, is involved among plaintiff's previous work history and the telephone solicitor job.

Medical Vocational Guideline 201.14 directs a finding of disabled when an individual is closely approaching advanced age, has at least a high school education, and whose previous work experience was skilled or semi-skilled with no transferable skills. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.14.  Medical Vocational Guideline 201.15 directs a finding of not disabled when an individual is closely approaching advanced age, has at least a high school education, and whose previous work was skilled or semi-skilled with transferrable skills.  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.15.  The ALJ's application of Medical Vocational Guidelines 201.15 was the proper framework within which to find plaintiff not disabled, as the evidence demonstrates that plaintiff acquired transferrable skills during his past relevant work.

Because the ALJ properly relied on the testimony of the vocational expert as to transferrable skills and the definition of transferrable skills, this Court is satisfied that there is substantial support for the ALJ's assignment of the aforementioned transferrable skills to plaintiff, leading to a finding that he was not disabled under Medical Vocational Guideline 201.15.

### iv.    The ALJ's Consideration of the Vocational Expert's Testimony

Plaintiff argues that the ALJ did not resolve the conflict between the vocational expert's testimony as to plaintiff's capability of performing a telephone solicitor job, notwithstanding disability, and the physical requirements of such job.  (Pl. Br. 10-11.)  Plaintiff notes that the

vocational expert testified that the telephone solicitor job requires frequent fingering and handling and reading, specifically arguing that the "undisputed" medical evidence demonstrates that plaintiff has significant limitations with regard to fingering and handling and visual acuity. (Pl. Br. 11.)

The Commissioner asserts that the ALJ used a proper hypothetical, reflecting plaintiff's vocational factors and the ALJ's RFC determination, in eliciting the vocational expert's testimony as to plaintiff's ability to work. (Def. Br. at 25-26.) The Commissioner also argues that the record, taken as a whole, does not support the limitations plaintiff claims make him unable to perform the telephone solicitor job. (Def. Br. at 26.)

The vocational expert testified before the ALJ on August 3, 2004, at which time the ALJ presented the vocational expert with hypothetical questions, asking the vocational expert to assume an individual who could lift ten pounds on an occasional basis and less than ten pounds on a frequent basis, carry ten pounds on an occasional basis and less than ten pounds on a frequent basis, occasionally climb stairs, never climb ladders, occasionally perform jobs that require a good sense of balance, and occasionally bend or stoop. (Tr. 47.) The ALJ added further restrictions to his hypothetical questions, requesting that the vocational expert assume an individual who could not work around unprotected heights or moving or dangerous machinery, could not use written instructions to do the job, and could not perform work requiring good visual acuity. (Tr. 48.) Based on the ALJ's hypothetical limitations, the vocational expert testified that plaintiff could not perform his past relevant work, but that he could perform work as a telephone solicitor. (Tr. 48.)

The vocational expert further testified as to the job description for telephone solicitor

21

listed in the Dictionary of Occupational Titles ("DOT") for the telephone solicitor job.  (Tr. 49.)

The vocational expert stated the description as follows:

> "Elicits orders for merchandise or services over telephone, calls prospective customers to explain type of service or merchandise offered, quotes prices, tries to persuade customers to buy, use, prepares sales talks, records names, addresses, purchases, and reactions from prospects solicited.  Refers orders to other workers for filing, keys data from order card into computer using keyboard, may develop lists of prospects from city and telephone directories, may type reported sales activity, and may contact driver sales route to arrange delivery of merchandise."

(Tr. 49.)  Plaintiff's attorney asked for clarification as to the actual visual requirements of the job, in response to which the vocational expert testified that there were no detailed reading requirements and oral training was common in the industry.  (Tr. 50.)  The vocational expert also testified that the manual dexterity code associated with the telephone solicitor job entailed frequent fingering and handling.  (Tr. 51.)

Plaintiff's assertion that he is wholly precluded from being able to perform the work at all because the job requires some reading and frequent fingering and handling is unsupported by the medical evidence.  While the job may require some data entry and typing, which necessarily involve reading, the majority of duties related to the job do not entail an ability to read, but rely more on an ability to speak.  Further, although plaintiff claimed he could only read with a magnifying glass and that "no glasses will help vision" on March 30, 2002, he later acknowledged he could drive small distances during the day in the activities of daily living questionnaire filled out on April 1, 2002.  (Tr. 118, 120.)  Despite plaintiff's claim that his sight is "beyond repair," none of plaintiff's physicians have come to this medical opinion.  (Tr. 127.)  Notably, during plaintiff's most recent visit to Retina Associates on May 24, 2002, Dr. Springer

recommended that glasses would improve plaintiff's visual acuity.  (Tr. 227.)

Further, although plaintiff asserts that he has significant limitations with respect to fingering and handling, his medical records do not support this assertion.  On February 21, 2002, Dr. Kramer reported that plaintiff performed rapid movements of the feet and hands well.  Then on June 19, 2002, Dr. Merlin noted that plaintiff had full use of both hands and arms in dressing and undressing and his grasping strength and manipulative function were not impaired.  (Tr. 256.)  Dr. Walsh came to the same conclusion on June 27, 2002, finding plaintiff had unlimited fingering and handling abilities.  (Tr. 265.)  Therefore, this Court is not persuaded that plaintiff's medical condition makes him unable to perform the telephone solicitor job identified by the vocational expert.

Occupational evidence given by a vocational expert should be consistent with the information supplied by the DOT; however, when there is a conflict between the vocational expert's testimony and the DOT, the ALJ is required to elicit a reasonable explanation for the conflict.  Social Security Ruling 00-4p.  Neither the DOT nor the vocational expert's testimony are dispositive when a conflict arises; rather, the ALJ must resolve the conflict by determining if the testimony of the vocational expert is "reasonable and provides a basis for relying on the ... testimony rather than on the DOT information."  Id.

Plaintiff's argument that the ALJ did not properly resolve any conflict between the vocational expert's testimony and the DOT's description of the telephone solicitor job is not supported by the transcript of the hearing.  Upon questioning by plaintiff's attorney, the vocational expert clarified exactly what the DOT's description entailed as to reading requirements, correcting plaintiff's attorney's mistaken assumption that the job required reading

23

of reports or any detailed reading.  (Tr. 50.)  Plaintiff takes issue with the vocational expert's testimony in response to the ALJ's hypothetical scenario concerning the limitation imposed that the individual could not use written instructions "to do the job."  (Tr. 48.)  However, this was also resolved by the vocational expert's testimony that oral training was common in the sales environment.  (Tr. 50.)  Therefore, this Court is also not persuaded by plaintiff's argument that the ALJ erred by not procuring an explanation for the conflict between the vocational expert's testimony and the DOT because there was no material conflict between the two.

**v.      The ALJ's Consideration of Side Effects of Plaintiff's Medications on His Ability to Work and Evaluation of Plaintiff's Credibility**

Plaintiff argues that the ALJ failed to consider the side effects of plaintiff's medications on his ability to engage in work activities and his subjective complaints of fatigue, loss of balance, and cognitive limitations.  (Pl. Br. 16-17.)  Plaintiff asserts that he routinely takes 12-14 medications a day, which must be administered by his wife due to his vision impairments, and requires daily insulin injections, which cause a "disruption of his routine."  (Pl. Br. at 17.)  In addition, plaintiff claims the ALJ failed to properly evaluate plaintiff's credibility by not considering all of the regulatory factors and failing to make a credibility finding at all.  (Pl. Br. at 17-18.)

The Commissioner argues that the ALJ looked at the evidence in a light favorable to plaintiff, finding his subjective complaints not credible to the extent they imposed greater limitations than the record indicates.  (Def. Br. at 22.)  The Commissioner specifically notes that the ALJ took into consideration objective medical evidence, plaintiff's subjective complaints, plaintiff's daily activities, the nature of his pain, treatment, and other measures used for the relief

24

of pain or other symptoms, finding plaintiff not entirely credible.  (Def. Br. at 22-24.)

Plaintiff's subjective complaints will not be found to affect his ability to do basic work activities unless the medical evidence of record shows that a medically determinable impairment could reasonably be expected to produce the symptoms alleged.  20 C.F.R. § 404.1529(b).  In addition to objective medical evidence alone, the ALJ must consider additional factors when assessing credibility, including the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. 404.1529(c)(3), see also Social Security Ruling 96-7p.

Plaintiff listed the side effects associated with his medications as fatigue, slow heart rate, bruising, shaking, and blurred vision in his disability report.  (Tr. 106, 108.)  Not only does the medical evidence not support plaintiff's subjective complaints, but plaintiff's own statements are contradictory to the symptoms he purports make him unable to work.  Consistency, or lack thereof, is a strong indication of the credibility of an individual's statements.  Social Security Ruling 96-7p.  Despite plaintiff's subjective complaints of vision problems and reports that he had stopped working as a driver in 2001, plaintiff admitted to Dr. Merlin, during an examination in June 2002, that he was currently working for a car service.  (Tr. 101, 256.)  Moreover, the ALJ noted in his opinion that Dr. Davis reported that plaintiff's blood sugars were under control, his

25

coronary artery disease was being maintained with medication, and that his eyesight was fairly stable with poor night vision.  (Tr. 21.)

Plaintiff asserts that the ALJ erred in not discussing all seven regulatory factors enumerated in 20 C.F.R. § 404.1529(c)(3), citing Canales v. Barnhart, in which the court found that the ALJ's decision to deny benefits was not supported by substantial evidence because the ALJ did not adequately discuss all seven factors.  Canales v. Barnhart, 308 F. Supp.2d 523, 528 (E.D. Pa. 2004.)  However, the present case is distinguishable from Canales, upon which plaintiff relies, in that the ALJ did pose a hypothetical embodying plaintiff's subjective complaints during the hearing.  The ALJ noted in his decision that plaintiff testified at the hearing that he has taken insulin injections since 1962, has had several laser eye surgeries, has no peripheral vision, and needs a magnifying glass to read.  (Tr. 20.)  The ALJ also noted that plaintiff testified that he could lift and carry "a couple of pounds" and sit or stand for about twenty minutes.  (Tr. 20.)  In his hypothetical to the vocational expert, the ALJ addressed the subjective visual limitations plaintiff testified to, asking the vocational expert to assume an individual who could not work around moving or dangerous machinery, could not use written instructions to do the job, and could not perform work requiring good visual acuity.  (Tr. 48.)  The ALJ also addressed the functional limitations plaintiff testified to, asking the vocational expert to further assume an individual who could lift ten pounds on an occasional basis, less than ten pounds on a frequent basis, and stand for only fifteen minutes at a time.  (Tr. 47.)  In response, the vocational expert testified that plaintiff could perform work as a telephone solicitor.  (Tr. 48.)

Indeed, plaintiff does not articulate which of these seven factors the ALJ did not consider that weighs in favor of a finding of disability.  The ALJ elicited testimony from plaintiff as to his

26

daily activities, the location and intensity of his pain, factors that precipitate and aggravate his symptoms, the type and side effects of his medications, and measures other than treatment or medication the individual uses for relief of pain or other symptoms.  (Tr. 38-44.)  In his decision, the ALJ also noted his obligation to consider the factors in 20 C.F.R. § 404.1529, leading to a finding that plaintiff's statements were "not totally credible" based on the entire record.  (Tr. 20-21, 23.)  Further, there is no binding legal authority that these seven factors are conjunctive rather than guiding.  The Court therefore finds a sufficient credibility analysis by the ALJ and affirms on this ground as well.

The ALJ found plaintiff's statements "not persuasive to establish 'disability' in light of the degree of medical treatment required; the reports of the treating and examining practitioners; and his medical history."  (Tr. 21.)  The ALJ also explicitly found plaintiff's allegations regarding his limitations "not totally credible" in the findings section of his decision.  (Tr. 23.)  Therefore, this Court is satisfied that the ALJ made an adequate credibility finding.

For these reasons, the Court finds the ALJ's analysis of plaintiff's credibility was sufficient and that his conclusions with regard to plaintiff's subjective complaints were supported by substantial evidence.

## III.    CONCLUSION

For all of the foregoing reasons, the Court finds that the ALJ's decision was supported by substantial evidence and is hereby **AFFIRMED**, and plaintiff's appeal is **DENIED**.  An appropriate Order will follow.

Dated: July 26, 2006                                          s/ Stanley R. Chesler
                                                                      United States District Judge